THE STATE ex rel. PROUDFIT *vs.* HASTINGS, TREAS-
URER, &c.

This was an action commenced by Andrew Proudfit, by
information for a mandamus, against Samuel D. Hastings,
the State Treasurer, to compel him to pay out of the state
treasury to the relator $5645,25. The information set forth
that Calkins & Webb were the state printers, and as such
they had printed and furnished to the Secretary of State, by
his order, blank forms amounting to 5640 quires, worked on
both sides. The account for these blanks was presented to
the Secretary of State for him to audit, ön the 13th of Nov.,
1858, duly verified by affidavit; and certified to be correct
on the 15th, by the assistant secretary of state. On the same
day a warrant was drawn on the treasurer for the amount,
and given to Calkins & Webb. All these certificates, and
the warrant, were signed by the assistant secretary of state,
and not by the secretary himself. These blanks were forms
for the use of the assessors and others in assessing and col-
lecting the taxes for that year, and to be sent to the sev-
ral clerks of the boards of supervisors of the counties, and to
be used by those officers.

The warrant was then assigned to the relator. On the
15th of July, 1859, he presented the warrant for payment to
the treasurer, who refused to pay the same, though there was
plenty of unappropriated moneys for that purpose in his
hands, and still refused. Therefore this action was brought.
After the service of the alternative writ, the respondent moved
to quash the writ, and assigned for cause that the petition did
not state facts sufficient to entitle the relator to the writ.

*C. Abbott,* for the respondent, made the following points:

1. The Secretary of State had no authority in law to or-
der or request the printing of the blanks in the writ named,
or contract in any way for the printing of the same, so as to
bind the state. 2. It does not appear that the account or
claim was ever audited by the Secretary of State. 3. The
warrant was not countersigned by the comptroller of the
state, as required by section 5, of the act establishing that
office.

*George B. Smith* and *S. Crawford,* for the relator.

*By the Court*, DIXON, C. J. The opinion of this court upon the constitutionality of the act of May 17th, 1858, providing for the appointment, and prescribing the duties of the State Comptroller, the power of the assistant secretary of state to act as auditor, and the scope and extent of the authority of the secretary himself, when acting in that capacity, three of the questions involved in the present motion, will be found discussed in the case of the *State on the relation of Crawford against this same Defendant, supra,* 525. By a reference to that opinion, it will be seen that the first question was, by a majority of the court, resolved in favor of the relator, the second against him, and the third in his favor, provided it is determined that provision had been made by law for the payment of the claim in question, leaving nothing to be done but for the secretary to assertain and adjust its amount.

The only question, therefore, left for our consideration here, is whether there was such provision for the payment of the demand in controversy, or, in other words, whether any appropriation therefor has ever been made. This question depends entirely upon the construction to be given to section 15, of chapter 115 of the Laws of 1858. If by that section the legislature authorized the Secretary of State to contract for, and procure the printing of the forms charged in the account, then I apprehend there could be but little doubt of the liability of the state, and the secretary's certificate of the amount of an indebtedness thus lawfully incurred, and which he was empowered to audit, would be a sufficient authority to the treasurer for its payment. If, on the other hand, the secretary was not authorized to contract for the printing of such forms then, according to the principles laid down in the opinion referred to, his certificate of allowance would have been no justification for a payment by the treasurer, for the reason that it would have been an unauthorized act, not

binding upon the state or any of its officers. He is only authorized to audit, and the treasurer to pay, in cases where appropriations have been made by law for that purpose ; and, as in this case, it is not pretended that there has been any direct or specific appropriation, the decision must turn upon the power of the secretary to make the contract.

It is clear to us that the secretary had no such power; and this, we think, will be sufficiently obvious by a reading of the section itself, which is as follows : " It shall be the duty of the Secretary of State to prepare, and cause to be printed, the necessary forms to carry into effect the provisions of this act, and to transmit copies of such forms to the clerk of the board of supervisors of each of the counties in this state, immediately on the publication of this act; and it shall be the duty of each of said clerks to cause to be printed, for the use of the assessors of the several townships in his county, such number of said blank forms as may be necessary." The intention of the legislature is so manifest from this language, that it is almost useless, by reasoning, to attempt to make it plainer. It was that the secretary prepare a proper form, and that he should procure so many of them to be printed and distributed among the clerks of the several boards of county supervisors as would be necessary to serve as copies, from which they might cause a sufficient number to be printed to supply the assessors of the several townships of their several counties respectively. The authority thus confered was not general and unrestricted, but was limited by the object to be attained, which was to furnish copies from which the forms themselves might be printed at the expense of each county. The intention was not to furnish all necessary blanks at the cost of the state, but copies after which each county might, at its own proper charge, provide itself.

Whilst it may be admitted that the secretary was endowed with a certain discretion as to the number of copies with

which he might furnish each clerk, still he was limited to such as might reasonably be required, under the circumstances, to ensure the accomplishment of the purposes in view, one copy might answer, but prudence and safety might demand that more be sent; and so long as he acted within the bounds of reason, his conduct could not be assailed. But to say that, under it, he might print, distribute, and charge the state with the payment of the price of 135,000 and upwards, for the purpose of supplying 52 counties with copies, is too preposterous to be listened to for a moment. The act conferred no such authority, and the legislature never intended it. The treasurer, consequently, was, for this further reason, right in refusing payment, and the motion on that ground must be sustained.

It is urged that the secretary was justified in this extraordinary stretch of power, because there was not sufficient time between the passage and publication of the act, and the time when, according to law, the blanks should have been in the hands of the several town assessors, for the clerks of the several counties to procure and distribute them. This is clearly no excuse. It is not for the secretary, or any other officer, to cure defects, or omissions, in the legislation of the state. This power is vested in the legislature alone.

The motion to quash the alternative writ of mandamus, issued in this case, is, therefore, sustained, with costs.


COLE, J. I deem it necessary and proper to file an opinion in this case, for the purpose of stating briefly the grounds upon which I think the motion to quash the alternative writ of mandamus must be sustained. The members of the court are unanimous in the opinion, that the motion to quash must prevail; but not agreeing upon all the points relied on in the motion to quash, we sustain it upon somewhat different

grounds. Some of the questions involved are of sufficient practical importance to justify each member of the court in expressing his views upon them.

The motion to quash is for the following reasons: 1st. The Secretary of State had no authority in law to order or request the printing of said blank forms in said writ named, or to contract in any way for the printing of the same, so as to bind the state. 2d. It does not appear that said account or claim was ever audited by the Secretary of State. 3d. That said warrant, in said writ named, was not countersigned by the comptroller of the state, as required by section 5, chapter 155, of the Laws of 1858. 4th. For other defects appearing on the face of the said petition.

The application is for a mandamus, to compel the respondent, the treasurer of the state, to pay a claim, amounting to $5,640 25, for printing 5,640 quires of blank assessment forms, ordered, as is alleged by the Secretary of State, of the state printer, for the use of the various counties of the state. The account was audited by the assistant secretary of state, and assigned by the state printer to the relator, who insists that the treasurer should pay it. This claim the respondent has refused to pay, and, as we think, very properly, for several reasons.

In the first place, we are all clearly of the opinion, that the Secretary of State had no legal authority to order this amount of blanks to be printed, and as a matter of course, could not bind the state by his action in that behalf. A public agent cannot bind the government unless acting within the scope of his authority; and there is no hardship in requiring from private persons dealing with public officers, the duty of inquiry as to their real or apparent power and authority to bind the government. This rule is well settled by the authorities, and is founded in reason and necessity, to guard the public against losses and injuries arising from the

fraud or mistake, or rashness and indiscretion of public agents. Story on Agency, section 307 ; *Lee vs. Munson,* 7 Cranch, 366. Now, section 15, chapter 115, Session Laws, 1858, makes it the duty of the Secretary of State to prepare and cause to be printed the necessary forms to carry into effect the provisions of the assessment law, and to transmit copies of such forms to the clerk of the board of supervisors of each county in the state, immediately after the act was published; and it was further made the duty of each of the said clerks to cause to be printed, for the use of the assessors of the several townships in his county, such number of blank forms as might be neeessary. This is a very clear and distinct provision of law prescribing what the Secretary of State should do in regard to the blank forms mentioned in the relation. It does not authorize him to cause to be printed blank forms for the use of the various counties of the state, but quite the contrary. He is only authorized to have a few forms printed, so that he can furnish the clerk of each of the county boards of supervisors with a copy ; and the clerk is the officer whose duty it is to have the necessary forms printed for the use of his county. The object of this provision of law is very manifest. In order to secure accuracy and uniformity in the blank forms, the Secretary of State was to prepare one. He was then required to have the form printed, and furnish the clerk of each of the county board of supervisors with a copy. Evidently all the secretary required, and all he was authorized to have printed, in order to carry out the act of the legislature, and discharge the duty imposed upon him, was a few hundred printed forms. Instead of ordering that amount struck off, he caused to be printed a hundred and thirty or forty thousand. This conduct of his was wholly unauthorized, and it is difficult to believe that the state printers did not know the secretary had no power whatever to have such a quantity of printed forms struck off. At all events, they

were bound to know the extent of his authority in the premises, and to take notice that he could not bind the state by any such order. It is insisted that the Secretary of State was authorized to order from the state printer such printing as might be necessary and convenient for his department. Undoubtedly he was; but the printing ordered in the present case was not necessary for his department, and could not be used in his department. The blank forms were indubitably designed for the use of the various counties in the state, and as already remarked, the secretary had no authority to have forms furnished for that purpose. I am therefore of opinion, that the relation shows no cause entitling the relator to a peremptory writ, and that the first ground assigned in the motion to quash the writ is sound and well taken.

And here, perhaps, the discussion in this case might properly end; but as my brethren think we ought to express our views upon the other grounds assigned in the motion, I proceed to briefly notice them.

It is objected that it does not appear from the relation that the account was ever audited by the Secretary of State. Assuming the account to be a proper one against the state, and one which the state is liable to pay, still it is contended that the respondent was not authorized to pay it until it was audited. The argument is this. The relation shows that the account was audited and allowed by the assistant secretary of state, but the constitution, section 2, article 6, makes the secretary himself auditor, and the duties of an auditor, it is insisted, are personal, and, like the duties of a judicial officer, must be performed by the officer in person. I am not able to admit the soundness of this position. I grant that the constitution declares that the Secretary of State "shall be *ex officio* auditor." But what is an auditor? Webster's definition is: "A person appointed and authorized to examine an account or accounts, compare the charges with

the vouchers, examine the parties and witnesses, allow or reject charges, and state the balance." Johnson gives this definition , "A king's officer, who yearly examining the accounts of all under officers accountable, makes up a general book." "An officer whose duty is to examine the accounts of officers who have received and disbursed public moneys by lawful authority." 1 Bour. Law Dic., 152. "An officer or person whose business is to examine and verify the accounts of persons entrusted with moneys." " In American law, an officer of the treasury of the United States, whose duty is to examine the accounts of officers who have received and disbursed public moneys by lawful authority. 1 Burrill L. Dic., 116. "Auditor, in the language of the ancient law : an officer of the courts, whose duty it was to interrogate the parties. In a narrower sense, an officer who overlooks accounts." 1 Encyclopædia Americana, p. 463. "Auditor in English law, is an officer of the Queen, or some other great person, who, by examining yearly the accounts of the under officers, makes up a general book, which shows the difference between their receipts and charges, and their several allowances." 4 Encyclopædia Britanica, p. 236.

The legislature had a very clear and just understanding of the import of the term " auditor," when they prescribed the powers and duties of the Secretary of State acting as auditor. It was made his duty " to superintend the fiscal concerns of the state, and to manage the same in the manner required by law ; " to keep, fair, clear, distinct and separate accounts of all the resources, funds and incomes of the state ; and also of all expenditures, disbursements and investments thereof, showing the particulars of every expenditure, disbursement and investment ;" " to carefully examine, quarter yearly, the books and accounts of the Treasurer, and the moneys on hand in the treasury, and immediately thereupon report the result of such examination in writing, to the Governor, specifying therein

the amount and kinds of funds particularly;" " to keep and state all accounts between this state and the United States, and all other accounts in which the state is interested;" to examine and settle the accounts of all persons indebted to the state, and to certify the amount or balance to the treasurer;" " to direct and superintend the collection of all moneys due the state;" " to examine and determine the claims of all persons against the state, in cases when provision for the payment thereof shall have been made by law, and certify the same to the State Treasurer," &c. Section 19, chap. 9, R. S., 1849; sec. 27, chap. 10, R. S., 1859.

These are some of the duties of auditor as prescribed by the legislature, and, although multifarious and important, I see no one among them implying such personal trust and confidence in the auditor, or demanding such peculiar fitness and qualification in the person discharging it, as to say that it can only be performed by the secretary in person. The duties of the officer are not analogous to the duties of a judge or member of the legislature, which must be discharged in person by the incumbent; neither can I believe that the framers of the constitution contemplated they would all be performed by the secretary in person. It was undoubtedly expected that the secretary by himself and assistants would perform these various duties, and that the secretary would exercise a general control over all matters of this nature transacted in his department. But the secretary could not do every thing in person. And if it be asserted that the secretary must audit and allow all claims against the state, why is it not equally necessary that he should keep the books, state the accounts, and do and perform all other matters and things which an auditor by law is required to do? The Secretary of State is expressly authorized by law to appoint an assistant, who is required to take the oath of office prescribed by the constitution, and to give a bond for the faithful performance of his duties.

And, it is declared, that "such assistant may perform and execute all the duties of Secretary of State, except as commissioner of school and university lands, and as member of the board of regents. It is clear, from this language, that the legislature intended to confer upon the assistant secretary of state power to audit and allow accounts in the same manner and to the same extent as the secretary himself might do; and I have no doubt but it was competent for the legislature to clothe the assistant with that authority. So that, if I considered the claim set forth in the relation a just one against he state, I should be compelled to hold that it had been properly audited.

The third ground relied on in the motion to quash is, that the warrant in the writ named was not countersigned by the comptroller of the state, as required by sec. 5, chap. 155 of the Session Laws of 1858. That section provides that the comptroller should countersign all warrants drawn by the Secretary of State upon the State Treasurer, which shall be authorized by law, and no warrant shall be paid by the State Treasurer unless the same shall be countersigned by the comptroller, and the act or parts of act authorizing the payment of such warrant, be particularly stated in such warrant. The warrant not being countersigned by the comptroller, I consider a good and sufficient reason why the treasurer should not pay it. It is said however, in answer to this objection, that chap. 155 is unconstitutional, and therefore that the condition therein imposed that the treasurer should pay no warrant unless the same were countersigned by the comptroller, is null and void. And to show that this law is unconstitutional, it is said that the legislature has therein attempted to deprive the Secretary of State of his constitutional power and authority as auditor, and to devolve that duty upon the comptroller. I do not so understand the law and the constitution. I have already referred to the clause in the constitu-

tion which declares that the Secretary of State "shall be *ex officio* auditor." Does the law creating the office of comptroller attempt to deprive the Secretary of State of his power, duty, or authority, as auditor? I think not. The second section of the act in defining the duties of the comptroller, says that he shall examine and pass upon all claims and *accounts audited by the Secretary of State*, and if he shall find the same properly verified or proved, and authorized by law to be audited, he shall certify that fact upon such claim or account. The third section provides that "all claims and accounts against the state, authorized by law to be audited, shall be audited by the Secretary of State as required by law. The order of the Secretary of State, auditing any claim or account, shall be endorsed on or annexed to such claim or account, and shall state particularly the acts or parts of acts which authorizes such claim and confers the power to audit the same, and, together with such claim and all evidence relating thereto, shall be delivered to the comptroller for his examination, and shall thereafter remain on file in his office.

There is nothing in these provisions which will warrant the presumption that the legislature intended to deprive the Secretary of State of his power and authority as auditor, but the language used would lead to the contrary conclusion. For in most clear and unambiguous terms the act declares that all claims and accounts against the state, authorized by law to be audited, shall be audited by the Secretary of State; thus, not only recognizing the constitutional right or power of the secretary to audit accounts, but even attempting to enact or confer that power upon him by this very law. But it is objected that because it was made the duty of the comptroller to examine and pass upon the accounts audited by the secretary, that this is intrenching upon the power of that officer, and an effort to transfer by an indirect legislation the auditing power, to the comptroller. I do not think this was the object or pur-

pose of the act. The law was passed undoubtedly to throw additional restraints and safeguards around the public treasury. It requires that before a person should be entitled to draw money from the state treasury upon a claim audited by the secretary, that such claim shall be submitted to another officer and certified to be correct. Is it not competent for the legislature to make such provisions to protect the public moneys, and to establish as many conditions precedent to drawing money from the treasury, as may be deemed necessary ? I do not understand that because a person has a claim audited by the Secretary of State, that he has a constitutional right to go to the treasury and obtain the money upon it. The public moneys are under the control of the legislature, which may impose such conditions upon drawing it from the treasury as may be deemed proper. Suppose the legislature should provide that no money should be paid upon a claim audited by the Secretary of State, until the same had been referred to the Attorney General and certified to be correct, would such an enactment be unconstitutional ? Or suppose it was required to be referred to the Governor for his examination and certificate, before the treasurer was authorized to pay it ? Such restrictions might be very salutary and necessary to prevent frauds and mistakes in the disbursements of the public funds. Considering the many important duties which the secretary is called upon to perform, his proper duties as secretary of State, as auditor, and commissioner of the school and university lands, and it might be absolutely impossible for him to bestow that labor and examination upon a difficult claim, necessary to ascertain the just amount due upon it. And the legislature might well provide for referring such claims to the law officer of the state, or to an officer specially appointed for that purpose, after they had been audited by the secretary. Cannot the legislature guard the public interests, and protect the public treasury against the consequences of fraud, accident

State vs. Hastings.

or mistake, by throwing around it such safeguards as may seem wise and proper? I have no doubt of it, and such, I think, was the design of the law. It might have been a piece of misjudged or unwise legislation. But that does not affect the question of power which we have been considering.

It was also contended upon the argument in behalf of the relator, that the conduct of the respondent, in refusing to pay the amount mentioned in the relation, was extraordinary and unjustifiable; and it was insisted that when a claim was once audited by the Secretary of State, this action of his was final and conclusive upon the rights of the State, and that the Treasurer must proceed to pay it without question, when presented to him. The fault that the Secretary has audited an unjust or unfounded claim against the state, does not render such claim valid, and the Treasurer would be derelect in duty if he did not refuse to pay a claim of that character, though audited, when he knew that it was not legal and just

For these reasons, I think the motion to quash the alternative writ should be sustained.

NOTE.—The statements referred to by the judges, as being on file before the several opinions above given were written, were filed on the 20th of August, 1859, at the time of overruling the demurrers. In Crawford's case the court held:

1. The act of the legislature, approved May 17, 1858, entitled, "An act providing for the appointment of a comptroller, and prescribing his duties," incorporated into chapter 10 of the Revised Statutes of 1858, as chapter 155 of acts of a general nature of 1858, which created the office of comptroller, and authorizes him to "examine and pass upon all claims and accounts audited by the Secretary of State, is unconstitutional and void. COLE, J., dissenting.

2. Chapter 41, of the General Laws of 1856, entitled "An act concerning the terms of office of judges of the several courts of this state," which provided that the terms of office of county and circuit judges, and justices of the supreme court, should commence on the first Monday of each year next after the election of such officers, was constitutional. Therefore, the relator was entitled to hold and exercise the duties of the office of associate justice of the supreme court, from the first day of June, 1855, until the first day of January,

1856, under the provisions of the constitution, that such justice shall hold his office until his successor is elected and qualified. PAINE, J., dissenting.

3. . A public officer who voluntarily surrenders his office to another claiming title thereto, under color of right and suffers such other person to discharge the duties and receive the salary provided by law therefor, in such a manner as to become an officer *de facto*, thereby waives and forfeits his right to demand or receive the salary so provided and appropriated. The return in this respect is good, and therefore the respondent properly refused to pay the draft of the Secretary of State, drawn on him for such salary.

In Proudfit's case, the court held:

1. Section 15 of chapter 115 of the General Laws of 1858, relating to the assessment and collection of taxes, incorporated into chapter 18 of the Revised Statutes of 1858, made it the duty of the Secretary of State, immediately after the publication of the act, to prepare, and cause to be printed, the necessary *forms* to carry into effect the provisions of the act, and to transmit copies of such forms to the clerk of the board of supervisors of each of the counties in in this state; and made it the duty of each of said clerks, to cause to be printed, for the use of the assessors of the several townships in his county, such number of said blank forms as might be necessary. Under this section the Secretary of State ordered the state printer to print and furnish 5640 quires of double work, making by the computation about 135,360 blanks. The printer furnished them to the secretary, by whom they were distributed through the several counties pursuant to the act. The account of the printer, amounting to $5640,25, was audited and allowed by the assistant secretary, who drew a draft, or order for the amount, upon the State Treasurer. The treasurer, on presentation of the draft, refused to pay the same. On a motion to quash the alternative writ in a proceeding by mandamus to compel the treasurer to pay the draft, by the petition for which these facts appeared: Held, that the court would take judicial notice of the number of counties in the state; that the action of the secretary in procuring such a quantity of *forms* was wholly unauthorized, and that the treasurer properly refused payment of the draft.

2. The state is not bound by the acts of its agents or officers, unless it manifestly appears that they are acting within the scope of their authority.

3. Section 2, of Article VI. of the constitution, makes the Secretary of State *ex officio* auditor, and reposes in him a personal trust and confidence, which cannot be delegated to, or exercised by another. The account, in this instance was audited and allowed, and the draft drawn by an assistant secretary of state, the allowance and draft are, therefore, void. COLE, J., dissenting.

4. The act of the legislature, approved May 17th, 1858, entitled, "An act providing for the appointment of a comptroller, and prescribing his duties," in-

Falkner vs. Guilk.

corporated into chapter 10 of the Revised |Statutes of 1858, as chapter 155 of Acts of a General Nature of 1858, which creates the office of comptroller, and authorizes him to " examine and pass upon all claims and accounts audited by the Secretary of State," is unconstitutional and void. COLE, J., dissenting.